# CHARLESTON.

## FIRST NAT. BANK OF CUMBERLAND *et al. v.* PARSONS *et al.*

### Submitted Sept. 15, 1898—Decided Dec. 17, 1898.

1.  CIRCUIT COURTS—*Duration of Term.*
    A term of a circuit court of one county can, if necessary, pro-
    long its session beyond 4 o'clock P. M. of the third day of the time
    fixed for a term in another county.    (pp. 690–93).

2.  CIRCUIT COURTS.
    Circuit courts of different counties in the same circuit may sit
    at the same time.    (p. 693).

3.  SURETYSHIP— *Release of Surety—Equity—Surrender of Property.*
    If a creditor surrender a lien or hold upon property of a prin-
    cipal debtor, which constitutes a substantial security for the debt,
    in part or whole, without consent of a surety, the surety is, in
    equity, discharged from the debt, in part or whole,  according to
    the value of the property ; but if the principal had really no title
    to the property, and it cannot be said to have a real value ap-
    plicable to the debt, and the surety is not injured by the sur-
    render, the surety is not discharged.    (p. 695).

4.. SURETYSHIP —*Release of Surety—Debtor and Creditor—Contracts.*

Mere indulgence of a principal debtor by a creditor, without a binding contract for such indulgence, based on valuable consideration, will not discharge a surety. (p. 698).

5. SURETYSHIP—*Continuance—Release of Surety—Contract.*

Mere continuance at a term of court of a suit against a principal debtor by consent of the creditor, not under any valid contract to continue, will not discharge a surety. (p. 698).

6. SURETYSHIP—*Release of Surety—Bill Quia Timet—Contracts.*

The principle on which an agreement for an extension of time discharges a surety is that the creditor thus deprives the surety of means of relieving himself by paying the debt and proceeding immediately against the principal, or, without paying, by filing his bill *quia timet* to make the surety pay, or by notice to the creditor under the statute. The surety is not discharged by an act which in no manner affected his right or impaired the remedies of the creditor. *Adams* v. *Logan*, 27 Grat. 201. (p. 698).

7. . INJUNCTION BOND—*Preferred Creditors—Judgment—Fraudulent Conveyance.*

An injunction bond payable upon the contingency specified in its condition, given before a deed of land which is a preference of one creditor over others, and which stands for the benefit of all creditors, on which bond judgment is recovered after the date of such deed, is entitled, under s. 2, c. 74, Code 1891, to share in said land, the owner of such judgment being a creditor. The contingent character of the bond makes no difference. (p. 700 ).

Appeals from Circuit Court, Tucker. County.

Suits by the First National Bank of Cumberland and others against Ward Parsons and others. From a judgment dismissing the bills, plaintiffs appeal.

*Reversed.*

W. B. MAXWELL and A. JAY VALENTINE, for appellants.

J. P. SCOTT, A. B. PARSONS, FRED. O'BLUE, and DAYTON & DAYTON, for appellees.

BRANNON, PRESIDENT :

The First National Bank of Cumberland and other creditors of Ward Parsons brought four separate equity suits against him and others, to set aside a conveyance of all real estate to his son Lemuel W. Parsons, as fraudulent; and, upon a joint hearing of the causes, a decree was entered December 14, 1897, dismissing the bills of these

creditors, selling the land for other creditors, but ignoring and disallowing the debts of those creditors, and they appeal.

One error assigned against the decree is that the circuit court of Tucker County was not lawfully sitting on the date of this decree, its term having expired, for the reason that the term of the circuit court of Preston County was fixed by law to begin December 11th, and the Tucker County court could not go on till December 14th. This presents a much-mooted and interesting and very important question, which ought to be definitely decided. It has been the understanding of the legal profession, so far as I am able to say, for many years, that a circuit court term legally ends at a point of time from which there only remains time enough, by the usual course of travel, to enable the judge to reach the next court in the circuit, and open it not later than four o'clock of the afternoon of the third day. This is an impression founded on *Mendum's Case*, 6 Rand. (Va.) 704 ; *Hill's Case*, 2 Grat. 595, and *Boice's Case*, 1 W. Va. 329. But in all of these cases the sentences alleged to be void because of the alleged expiration of the terms when they were rendered were sustained, because it appeared that a sufficient time remained after sentence for the judge to reach his next court by four o'clock after noon of its third day. In no one of them was the question decided. Is a judgment of a circuit court continuing to sit after it is too late for the judge to so reach and open his next court by four o'clock P. M. of its third day, rendered after that point of time, void, as being *coram non judice*, or voidable for that reason? In *Mendum's Case* the question is mooted, but not decided, but passed by because that sentence was in time for the judge to reach his next term. *Hill's Case* is the nearest approach to the decision of this question. The syllabus of the decision is that "the law has affixed no limit to the terms of the circuit superior courts except that the judge holding the court shall adjourn in time to hold the next court in his circuit at the time appointed by law; and the judge may continue the session of his court until the latest period which will allow him time to get to the next court by four o'clock P. M. of the third day of the term." Judge Duncan does not in his opinion, say just this, but per-

haps it is a fair construction of what he does say. Judge Baker said nothing of that kind. He only said it was the duty of the judge to go on with the prisoner's case after the expiration of his term as he did. But, at any rate, it is not the point of decision, legally speaking, but *obiter dictum;* for Hunter Hill was sentenced at nine o'clock A. M., in Nansemond County, and the court found, as it was certified, that the judge could travel the seventeen miles to the Isle of Wight Court in three hours, thus having four hours to spare. The same may be said of *Boice's Case;* the exact point now up was not decided, the judgment being held to be in time. This understanding has sprung from the generality of Judge Duncan's language in *Hill's Case*, whereas, it is not certain that he or the court intended to decide that a judgment rendered after the third day of the next term was void.

But assume that *Mendum's* and *Hill's Cases* decide that a term can last no longer than a point of time from which the judge can reach his next court by four o'clock P. M. of its third day, and that a judgment rendered later than that point would be void; I would then hold that these cases do not govern, because the statute existing then is different from that now in force. The statute governing those cases reads: "Each of the aforesaid courts shall sit until the business thereof shall be dispatched, unless the judge holding the same be compelled to leave the court, in order to arrive in time at the next succeeding court of his circuit, or at the general court." I Rev. Code, p. 229. Here, it might be said, was a limitation to the term by the letter of the statute. In *Mendum's Case*, Judge Bouldin states that two of the judges—Brockenbrough and Summers—were "strongly inclined to think that the qualifying words unless the judge be compelled to leave in order to arrive,' etc., are to be considered as directory or permissive only, and that of the necessity to go to the next court, or to finish what is before him, and what has already been begun, he is to judge, and, on his own responsibility, decide whether a compliance with the express orders of the legislature to dispatch the business before him, or go to the next court, as the law permits, will best subserve the public interest. They argue that

it is right it should be so, else there would often be a failure of justice. In some of our courts it sometimes happens that cases of the most important character could not be finished, and consequently would never be tried, unless the judge has power to run into the term of the next court to which his duty calls him ; and, as the legislature has fixed no precise limit, the construction which best fulfils their general purpose is the right one." But this point was waived, not decided.

Our present statute (section 2, chapter 114, of the Code) reads: "The supreme court of appeals and circuit court may at any time adjourn from day to day until the business is dispatched, or until the end of its term,"—meaning to authorize adjournment from day to day, and to continue these adjournents until the business is done, or until it actually adjourns ; the end of the term here meant being not that which happens from the coming on of the time fixed for another cnurt, but the actual end of the term by actual adjournment. This section leaves out that language in it when *Hill's Case* was decided, "unless the judge holding the same shall be compelled to leave the court in order to arrive in time at the next succeeding court of his circuit." The statute having changed, *Hill's Case*, if it decided the point, cannot apply. We must construe and apply our present act. Our statute law fixes dates for the commencement of terms, but fixes no express length of those terms. The only limitation is one to be implied, it may be said, by the coming of the time fixed for another court ; and, as each county has its time, the law intends to close one court when another begins. But it is only an implied termination. The judge is directed, it is true, to hold a court in the other county; but, if he continues in one county, the court of the other county is simply without a term,—the term is simply lost in the second county. The Preston term is simply lost or lapsed; but the Tucker term, already in session, if actually continuing, is still the circuit court of Tucker. It has not ceased to exist. It has its own separate, independent, existence as the circuit court of Tucker. The regular judge of the circuit—the person representing the judicial office and function in the circuit—is on its bench, and nowhere else; and it cannot be that its acts are void. The plain ob-

ject of the act is to continue the court until the business is done; but, as that might prolong its session indefinitely if it had to sit until all its business was dispatched, the act plainly contemplates the power to adjourn, though all the business may not be done, by the use of the words, "until the end of the term." Look at the inconvenience and evil resulting from a different construction. An important criminal cause, occupying days or weeks in one county, is on trial. All the evidence and arguments have been heard. The jury is out deliberating, but has not reached a verdict. The clock strikes the hour when the judge ought to leave to get to his next court. He calls in the jury, and disbands it; remands the prisoner to jail. All the expense and work go for naught, and, worse yet, the prisoner is deprived of his right of a speedy trial. I cannot yield to this construction, entailing so much evil, without a statute more plainly calling for it than our present statute. Therefore I think the acts of the circuit court of Tucker not void, though done by that court sitting any number of days into the term fixed for the circuit court of Preston. It seems to me that common sense, convenience, dispatch of the public business, range themselves on the side of one construction; mere idle technicality and inconvenience on the other. Two courts in the same circuit can proceed at the same time in different counties. The law provides that a judge of one circuit may hold in that of another. The circuit court of each county is a separate, distinct enity,—an existence in itself. Why a lawful judge may not sit in one county, another lawful judge in another county of the same circuit at the same time, I have yet seen no good reason. It does not appear whether the circuit court of Preston was going on at the time or not. If so, it would not, in my judgment, alter the case.

Under authority of the Constitution (Art. VIII., Sec. 15) the legislature, by Code 1891, c. 112, s. 11, has provided for holding circuit courts "when from any cause the judge shall fail to attend and hold the same, either at the commencement of the term, whether regular, adjourned or special; or if he be in attendance, and cannot properly preside," by the election of special judges. The special judge is a judge, under the Constitution and statute, vested with circuit court

powers, and just as much authorized to hold a circuit court as the regular judge,—considerations which, it seems to me, carry the conclusion that two courts in the same circuit can go on, under lawful judges, at the same time. The language of Constitution and statute is broad, — " When from any cause the judge shall fail to attend;"the evident purpose being to save the term when the regular judge does not come. Each court has a separate existence. It is created for the county. So it have a judge, it is a lawful court; and that it may have, the law has provided. What has the circuit court of Tucker to do with the circuit court of Preston, or the reverse? Why can they not both act at the same time? Public need and policy both say they can. I have no doubt of it.

I come now to the merits of the case. The case was once before in this Court, and the nature of it will be found in 42 W. Va. 137, (24 S. E. 554). Certain creditors of C. H. Barritt, Jr., had instituted chancery suits against him to recover debts, and levied attachments upon his personalty and land as his property; and there was a decree in the suits heard together, subjecting the personalty to sale, and decreeing the debts personally against Barritt, but no decree against the land, and referring the cases to a commissioner, to report the lands owned by Barritt, levied under the attachments, the condition and state of the title thereto, their owners and priorities. A few days later, bonds were given by Barritt, in which Ward Parsons was a surety, to release the personalty levied under the attachments of certain of the creditors. A few days later came a decree reciting that these bonds had been given, and the attachments released by the sheriff. In this decree occurs this clause, after declaring that the sheriff had released the attachments: " Thereupon, on motion of the said defendants, the decree entered in these causes at this term, directing a sale of the property which has been attached, is set aside, and, by consent of parties, no decree is to be entered in these causes in favor of the plaintiff at this term." Of course, the sheriff could not release attachments on realty, or the lien thereof. He possessed no power to do so. He could release the personalty only. It is said that the former opinion in this case decided that,

by the clause above quoted from the decree, the plaintiffs, by their consent, released the personal decree against Barritt, and thereby released the lien of that personal decree on his land, and thus absolved and discharged Ward Parsons, the surety in said replevin bonds, from all liability arising from them. I do not see how it can be said that said clause in said decree shows that the plaintiffs in those causes consented to the setting aside of the decree, when its terms show that it was the action of the court. The former decision was one of reversal, not affirmance, and question might be made of the effect of such opinion now, if it were material; but it is not. And question might be made, looking at other passages in the opinion, whether it was intended to finally pass upon the question, and hold that the clause showed that the plaintiffs consented to the setting aside of the decree. But it is useless to discuss that further. That opinion clearly left open for future ascertainments and decision whether that personal decree operated on any land, whether the land was of any value, whether it would have discharged the debts *pro tanto* or *in toto*.

Suppose, however, we say that the action of the plaintiffs in that decree is such as constitutes a surrender of a lien, if there was one, or to give further indulgence to the principal debtor, W. A. Barritt, Jr.; that will not discharge the surety, Ward Parsons, for we must then see whether it entailed injury on Parsons. If Barritt had no land to which the personal decree could attach, or if, though vested with a title, it was colorable only,—a mere shadow, constituting no substantial estate from which payment could be reasonably expected,—the surrender of this decree would not discharge Parsons. The question is: Did the surety really thus suffer a loss? 24 Am. & Eng. Enc. Law, 851, says: "A surety is released when the creditor parts with a lien for the payments of the principal's debt. The release or surrender of the lien or security will not, however, discharge the surety absolutely from all liability, but only to the extent of the loss which his action will cause the creditor." It will release *pro tanto* or *in toto*, according as the value of the property released was equal to or less than the property released. *Bank* v. *Parsons*, 42 W. Va. 138, (24 S. E. 554, Syl. point 8); *McKenzie* v.

*Wiley,* 27 W. Va. 661; *Mingus* v. *Daugherty* (Iowa), 54 N. W. 66.

Without detailing evidence, I can say that, when this decree was set aside, the two tracts of land to which Barrett had a paper title, and no possession, were not owned by him. His title was an empty shell. They were omitted from the tax books for many years, and were thus for'eited, and the legal title vested in the State, or in junior or other claimants. There was a right of redemption, it is true; but it is not possible to say the creditors had to institute proceedings, and pay out money to redeem. How much money? Likely more than their debts. And it would then avail nothing; for all this land was claimed under adverse titles, and their claimants in actual adverse possession for many years, and redemption would not take from them the forfeited title vested in them; and, if it could, they would hold all or great part by adversary possession, and perhaps by superiority of title. The creditor, the books say, need not use ordinary diligence, unless urged thereto by the surety. They could not sue the State to allow redemption of the land, because, the law provides for no such suit. Were they to wait, before proceeding on the replevin bond, till the State asked a sale of the forfeited land, and then redeem by petition? That would be a high degree of diligence, attended by large outlay and delay, which the law did not require of them. Further, these two tracts, before the so-called "release," were levied upon by attachment in a suit of the Bank of the Ohio Valley against Barritt, before attachments in which the bonds were given, in which Parsons was Barritt's surety, and were sold under decree in that suit, the tract of three thousand nine hundred and fifty-three acres realizing one thousand dollars, and that of three thousand four hundred and seventy-seven acres one hundred dollars, leaving three-fourths or more of the bank's debt unpaid; and the tract that brought one thousand dollars was bought in by it, else it would likely not have brought what it did. This shows alone that the personal decree against Barritt was not worth any sum which we could reasonably name. A redemption by those creditors would have been only for another creditor. The commissioner reported without details that the title to the tracts was "considerably clouded, the same over-

lapping several other tracts." He failed to answer the requirement of the decree that he report on the condition of the title any further. He reported their value upward of twenty-four thousand dollars, but that was on the basis of clear title. The evidence taken by him showed clouded, dangerous title; one witness, County Surveyor J. W. Bow- man, saying: "I am under the impression there isn't an acre of this land but what is owned by other parties" than Bar- ritt. And consider, too, that attachments levied in these creditors' cases on this land were not released. They were liens older than the personal decree. Parsons could be substituted to their lien on paying the debts, but they were worthless from the simple fact that Barritt' title was what is called in West Virginia vernacular, "wild-cat title," —a mere illusory will-o'-the-wisp. *Blydenburg* v. *Bingham*, 38 N. Y. 371, held that where a creditor releases from his judgment land in which it was thought such debtor might have some contingent interest for the purpose of relieving the premises from a possible cloud, it does not discharge the surety, where it is shown that in fact the debtor had no title whatever in the land released, and that, in consequence, the judgment never was a lien upon it. "Surety not re- leased by any act or conduct of payee which does not place surety in a worse position." *Driskell* v. *Mateer*, (Mo.) 80 Am. Dec. 105. The burden is on the surety who has vol- untarily assumed obligation, and asks that an honest debt shall be lost to its owner, to show that the creditor surren- dered something that would have availed to save him from loss. *Knight* v. *Carter*, 22 W. Va. 422 (Syl. point 6). But, if the burden were on the other side, enough is shown to show that no lien was released.

Having discussed the case as respects the setting aside of the personal decree, I next advert to the question, does the consent of the creditors not to ask a decree in the cases at that term of the court release the surety, Parsons? This was, clearly, not decided in our former decision. This comes under the head of indulgence to the principal. It is hardly indulgence. It fixed no new day of payment, and this is necessary to release surety. *Alcock* v. *Hill*, 4 Leigh 622; Brandt, Sur. s. 344. It is not the case of a new con- tract or novation of the debt, so as to discharge the surety

absolutely; but, if it discharges, it must be because it is mere indefinite indulgence. No consideration for this indulgence appears, and therefore, unless the fact that it is a consent of record changes it, the want of consideration prevents it from operating to tie the hands of the creditor, and therefore does not release the surety. Mere leniency, mere indulgence, extended often and often by creditor to debtor, does not discharge a surety. *Knight* v. *Charter*, 22 W. Va. 429; *Norris* v. *Crummey.* 2 Rand. 334; *Alcock* v. *Hill*, 4 Leigh 622; 3 Minor. Inst. 187. The most we can say is that such consent of record estopped the creditors from asking a decree that term of court. I do not know that it did that, as the parties might withdraw their consent with the court's leave; and the court seeing that it was based on no consideration, if the other party were present, or on rule, would set it aside, on motion of creditor or surety, if justice required. It was a mere consent not to prosecute that term, and not releasing the attachments or changing the status of the cases for future efficacy. It was only a continuance. Judge Woods says, in *Knight* v. *Charter, supra:* "The creditor may sue or not sue. If he sues, he may, if he pleases, dismiss or discontinue it. If he prosecute to judgment, he may or may not sue out execution." The cases support this statement. The syllabus says: "Sureties are not entitled to be absolved by want of diligence on the part of the creditor in prosecuting his demand against the principal." The surety "is not discharged by creditor's discontinuing proceedings against principal, where there was no abandonment of any absolute lien or security." *Springer* v. *Toothaker*, 69 Am. Dec. 66.

Here, too, comes another consideration. If that consent continuance did bind the creditors to a continuance, it did not tie the hands of the surety from any legal steps he might take for his security; and the cases all say that, if what the creditor does does not stop the surety from steps to save himself, he is not released, In *Norris* v. *Crumley*, 2 Rand. 329, Judge Green said that if the creditor's agreement still left the surety free to proceed against the principal, or pay and be substituted to liens, and there were left the attachments, or the surety might proceed himself

by bill *quia timet* against creditor and principal, "no injury is done to the surety by the creditor, and there is no possible reason for absolving him." The same is stated by Judge Moncure in *Shannon* v. *McMullin,* 25 Grat. 212, and in *Adams* v. *Logan,* 27 Grat. 201. It cannot be said that the steps of the surety—anything he might do to protect himself—were hindred by this continuance.

Under this head is another consideration; What good would a decree at that term of court have done the surety? I have shown that a personal decree as to the land would have been unavailing. So would a decree for its sale under the attachments, though they were left standing for future action. And Barritt was insolvent, except as to the personalty attached; and that was sold under attachments heard with those cases, in which no replevy bonds were given, and it was levied on, and Parsons, by going into the bonds, released it. How did the continuance prejudice him? Many authorities hold, even where there is a binding agreement to extend time, that thereby the surety must be actually prejudiced, to be relieved. "It must put him in worse position." *Driskell* v. *Mateer* (Mo.) 80 Am. Dec. 105; *Brown* v. *Wright,* 18 Am. Dec. 190; *Steele* v. *Boyd,* 29 Am. Dec. 226; *Fulton* v. *Matthews,* 15 Johns. 433, (8 Am. Dec. 261), where the court says: "A delay to sue, or even a discontinuance of a suit brought, cannot absolve the surety if he is passive and takes no measures indicating to the holder of the note that he insists on his proceeding against the principal. It ought to be put beyond a doubt that the surety is injured by the delay; that is, that the principal was solvent, and able to pay the debt, if he had been prosecuted for it." "Nothing from nothing, and nothing remains." It is apropos to this last eminent authority to say that no decree, personal or against the land, would yield any return, and the continuance did not make worse Parson's condition; and to remark, further, that he was passive, and was somewhat a party to the cases, by signing the bond to redeem the personalty from the attachment which laid him under obligation to see that there was a decree, if he wished one for his safety. His own act practically gave indulgence, and now he complains of creditors.

After the best consideration I am able to give this case,

I conclude that it is against equity to take from these creditors, their just debts, and release a party who stayed their hands in securing their money, and freely assumed the burden.   Before doing so, we ought to see some substantial wrong, actually prejudicing Parsons, done by these creditors.   The grounds on which he asks release are too unsubstantial.

L. W. James joins in this appeal because the decree disallowed his debt reported by the commissioner as a debt against Parsons.   Our former decision held that the land conveyed by Ward Parsons to his son Lemuel W. Parsons should answer all debts at the date of the conveyance against Ward Prrsons.   This James debt was excluded, on the erroneous opinion that it was nonexistent as a debt of March 4, 1892, the date of the deed from Ward to Lemuel W. Parsons.   This James debt was based on an injunction bond dated March 31, 1891, thus antedating the deed. Judgment on it was rendered against Ward Parsons March 15, 1894, after the deed.   The date of the judgment is immaterial, as the obligation of the bond began with its date. The fact that it was not, like a straight note, for the unconditional payment of a fixed sum, makes no difference, as it was an obligation to pay money in a certain contingency,—the dissolution of an injunction,—and James, claiming under it, is a creditor, under Code 1891, c. 74, ss. 1, 2 (both sections).   Whether the conveyance be fraudulent in fact, or merely voluntary, or one under section 2 held neither fraudulent nor voluntary, but a preference, and therefore standing for all then-existing debts or liabilities such an obligation comes in, though the liability be contingent.   *Wolf* v. *McGugin*, 37 W. Va. 564, (16 S. E. 797); 5 Am. & Eng. Enc. Law (1st Ed.) 179; Bump. Fraud. Conv. ss. 502, 503; *Hutchinson* v. *Kelly*, 1 Rob. (Va.) 123; *Scraggs* v. *Hill*, 43 W. Va. 172, (27 S. E. 310).   James' debt was improperly rejected.   So as to the debts of First National Bank of Cumberland, Daniel Miller & Co., Greer & Laing, and L. D. Rohrer.   Those debts must be allowed their proper participation, after preferred debts, in the property to be sold under a future decree.   Reversed and remanded.

*Reversed.*